1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DELBERT E. SPAIN, | ) | 1:11-cv-01133 GSA |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S** |
| | ) | **SOCIAL SECURITY COMPLAINT** |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **BACKGROUND**

Plaintiff Delbert E. Spain ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income benefits pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (*See* Docs. 8 & 10.)

1

## FACTS AND PRIOR PROCEEDINGS[2]

In August 2007, Plaintiff filed an application for supplemental security income benefits, alleging disability beginning December 25, 2003. *See* AR 128-131. Plaintiff's application was denied initially and on reconsideration; thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 78-96. ALJ Christopher Larsen held a hearing and issued an order denying benefits on November 13, 2009, finding Plaintiff was not disabled. AR 10-17.[2] On May 27, 2011, the Appeals Council denied review. AR 1-3.

**Hearing Testimony**

ALJ Larsen held a hearing on September 10, 2009, in Fresno, California. Plaintiff appeared and testified. He was represented by attorney Melissa Proudian. Vocational Expert ("VE") Thomas Dachelet also testified. AR 21-48.

Plaintiff was born on October 12, 1964, and was forty-four years old on the date of the hearing. He has never married and has no children. AR 25. He lives in Fresno with his sister, her husband and their two children. AR 26. Although he has a valid California identification card, Plaintiff does not have a driver's license. He depends upon family members for transportation. He has "no idea how to use" public transportation. AR 26.

While he did graduate from high school, Plaintiff attended special education classes throughout that period. He has never received any form of vocational training. AR 27.

Plaintiff last worked with his brother. The position was seasonal and part time, involving Christmas trees. AR 27-28. He does not believe he can work any job for five days a week, eight hours a day, because he could not "stand up" due to his back and legs. He also has a heart

---

[2]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[2]In an undated earlier decision, ALJ Michael J. Haubner found Plaintiff was not disabled. AR 52-59. In a Disability Report - Field Office, it is clear ALJ Haubner's decision followed a June 2007 hearing and preceded Plaintiff's current application.

1  condition.  AR 28.  Additionally, he dislocated his left elbow and suffers from scoliosis[3] of the

2  spine, and arthritis.  AR 29.

3       With specific regard to the scoliosis, Plaintiff's left leg is shorter than his right leg by

4  "[o]ne to two inches."  AR 38.  He has a lift in his left shoe and it does help.  AR 38-39. Plaintiff

5  has muscle spasms every night in his lower back and takes medication for the spasms and for the

6  pain.  AR 29.  A side effect of the medication is acid reflux.  AR 30.  When he was asked

7  whether he could bend down and pick something up off the ground that had fallen, Plaintiff

8  indicated he could do so but he would have to "bend all the way down to do it," it would cause

9  pain, and he would have to hold onto something in order to get back up.  AR 30.  He can twist

10 his body side-to-side slowly.  AR 30.  Sitting in hard chairs aggravates his back pain.  AR 32.  If

11 the chair is soft, Plaintiff can sit for a couple hours before getting up and walking around.  AR

12 32.  He can stand for about an hour and a half.  AR 32-33.  When he was asked how far he could

13 walk, Plaintiff indicated he could walk "about five lights," or the equivalent of a block per light,

14 but he waits for the light to change "a couple of times before" he crosses the street at an

15 intersection.  AR 33; *see also* AR 38.  Plaintiff lies down four to five times a day, for "[t]wo to

16 three hours" at a time.  AR 35.  One of his physicians mentioned he may need surgery on his

17 back, but no one has mentioned it recently.  AR 39-40.

18       Plaintiff's back pain has worsened over time due to arthritis in both his lower and upper

19 back; it is different than the pain from the scoliosis because the pain is sharper.  AR 34; *see also*

20 AR 38.  The arthritis pain bothers him every night and for a couple hours in the morning.  AR 35.

21       Plaintiff can reach overhead with his right arm, but not fully overhead with his left arm.

22 AR 30-31.  He indicated he can lift between five and ten pounds with his left arm, and could use

23 that arm repetitively for about an hour or an hour and a half before needing to rest it for an hour.

24 AR

25

26       [3]Scoliosis is an abnormal curving of the spine.  The curvature may look like the letter "C" or "S."
   Http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002221/.  Plaintiff testified his spine is curved in the shape of the

27 letter "C."  *See* AR 29.

28                                                3

31-32.  His left arm is weak.  AR 41.  With his right arm, Plaintiff indicated the heaviest weight

he could lift is "a 24 pack," although he does not know how much that weighs.  AR 33.

With regard to vision, Plaintiff indicated he cannot see out of his right eye: "It's fuzz."

AR 39.  With his glasses, he can see okay with his left eye.  AR 39.  When he was asked how

long he could concentrate and focus his attention, Plaintiff indicated he often forgets what he got

up to do, and will "have to go about three times before [he] remember[s] what [he] went for."

AR 41.  He can focus for about ten minutes, but for longer periods of time he forgets things.  AR

41-42.  He forgets to feed the dog until it growls at him.  AR 42.  He would need to take a one or

two hour break before trying to focus his attention on another task.  AR 42.

Around the house, Plaintiff tries to help his sister by vacuuming, feeding and watering the

birds, and caring for his dog and hers.  AR 36.  He does his own cooking with the microwave -

he is afraid to use the oven - and places the dishes in the dishwasher.  He does his own laundry.

AR 37.  Plaintiff will also water plants and trim the roses at his sister's direction.  AR 42-43.

VE Dachelet was asked to consider a hypothetical worker of Plaintiff's age, education

and work history, who is capable of light physical exertion, with occasional stooping, crouching,

and climbing of ladders, ropes and scaffolds, who can frequently balance, kneel, crawl or climb

ramps or stairs, and who can perform simple, repetitive jobs.  AR 44.  The VE indicated such an

individual is capable of all sedentary and light unskilled work.  AR 44.  In California, in the

second quarter of 2009, the VE indicated there were 86,255 persons employed in unskilled

sedentary positions, and in the unskilled light level, there were 1,047,460 persons employed in

California.  The national figure for sedentary unskilled positions is 712,598, and at the light

unskilled level the national figure is 8,719,215.  AR 44-45.

In a second hypothetical, the VE was asked to assume a similar individual, who could lift

and carry up to ten pounds, and who could stand and walk for a total of four hours, and sit for a

total of four hours, in an eight-hour workday.  VE Dachelet indicated that as a result of the

sit/stand option, the numbers provided earlier would be reduced by one-third.  The VE based the

reduction on his best estimate from job analyses and talking to employers and employees.  AR 45.

In a third hypothetical, assuming a hypothetical worker of Plaintiff's age, education and work history, the VE was asked to consider an individual would could perform simple, repetitive tasks, and who must have unscheduled breaks of about two hours during the work day, in addition to the customary breaks and meal period.  The VE indicated no work would be available for such an individual.  AR 45-46.

**Medical Record**

The entire medical record was reviewed by the Court.  AR 208-273.  The medical evidence will be referenced below as necessary to this Court's decision.

**ALJ's Findings**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 10-17.

More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 7, 2007.  AR 12.  Further, the ALJ identified spinal scoliosis and borderline intellectual functioning as severe impairments.  AR 12.  Nonetheless, the ALJ determined that the severity of the Plaintiff's impairments did not meet or exceed any of the listed impairments.  AR 12-13.

Based on his review of the entire record, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to lift and carry twenty pounds occasionally and ten pounds frequently, can sit or stand and walk for six hours in an eight-hour workday, may occasionally stoop, crouch, and climb ladders, ropes or scaffold, and may frequently balance, kneel, crawl or climb stairs or ramps, with the ability to perform simple repetitive tasks.  AR 13-16.

Next, the ALJ determined that Plaintiff had no past relevant work.  AR 16.  Nevertheless, based upon Plaintiff's age, education, work experience and RFC, the ALJ determined there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

1  Specifically, the ALJ found Plaintiff could perform all of the unskilled sedentary work available

2  in the national economy.  AR 16-17.  Therefore, the ALJ found Plaintiff was not disabled.  AR

3  17.

4  **SCOPE OF REVIEW**

5  Congress has provided a limited scope of judicial review of the Commissioner's decision

6  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

7  this Court must determine whether the decision of the Commissioner is supported by substantial

8  evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla,"

9  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

10  *Weinberger*, 514 F.2d 1112, 1119, n.10 (9th Cir. 1975).  It is "such relevant evidence as a

11  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

12  401.  The record as a whole must be considered, weighing both the evidence that supports and

13  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

14  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

15  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

16  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

17  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

18  substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

19  Cir. 1987).

20  **REVIEW**

21  In order to qualify for benefits, a claimant must establish that he is unable to engage in

22  substantial gainful activity due to a medically determinable physical or mental impairment which

23  has lasted or can be expected to last for a continuous period of not less than twelve months.  42

24  U.S.C. § 1382c(a)(3)(A).  A claimant must show that he has a physical or mental impairment of

25  such severity that he is not only unable to do her previous work, but cannot, considering his age,

26  education, and work experience, engage in any other kind of substantial gainful work which

27

28  6

exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

Cir. 1990).

In the instant appeal, Plaintiff argues that the ALJ's findings are not supported by

substantial evidence and are not free of legal error because the ALJ (1) changed a significant

limitation without new and material evidence to support the change; (2) failed to accord the

opinion of Plaintiff's treating physician the proper weight; (3) improperly relied upon the VE's

testimony; and (4) failed to provide clear and convincing reasons for rejecting Plaintiff's

testimony.  (Doc. 14.)

## DISCUSSION

### A.   *Chavez v. Bowen & The RFC*

Plaintiff argues that the ALJ erred when he failed to provide a "basis for changing the

material finding of limitation to one- and two-step tasks."  (Doc. 14 at 10; *see also* Doc. 19.)

More specifically, Plaintiff contends there is a "vast difference" between "generically simple

work and one- and two-step instructions."  (Doc. 14 at 10.)  The Commissioner asserts the ALJ's

limitation to simple, repetitive tasks was not a significant change.  (Doc. 18 at 7-9.)

When an applicant has one or more previous denials of applications for disability

benefits, as Plaintiff does here, he or she must overcome a presumption of nondisability.  The

principles of res judicata apply to administrative decisions, although the doctrine is less rigidly

applied to administrative proceedings than in court.  *Chavez v. Bowen*, 844 F.2d 691, 693 (9th

Cir. 1988); *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988).  Acquiescence Ruling 97-4(9),

adopting *Chavez*, applies to cases involving a subsequent disability claim with an unadjudicated

period arising under the same title of the Social Security Act as a prior claim in which there has

been a final administrative decision that the claimant is not disabled.  A previous final

determination of nondisability creates a presumption of continuing nondisability in the

unadjudicated period.  *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1995).  The presumption may

be overcome by a showing of changed circumstances, such as new and material changes to the claimant's residual functional capacity, age, education, or work experience. *Lester*, at 827-28; *Chavez*, 844 F.2d at 693.

In an earlier decision, ALJ Haubner determined that Plaintiff was not disabled. *See* AR 52-59. More particularly, ALJ Haubner's RFC finding provided, *inter alia*, that Plaintiff was "limited to simple repetitive one or two-step tasking." AR 55. As a result, a presumption of continuing nondisability applies to ALJ Haubner's determination. *Lewis v. Chater*, 81 F.3d at 827.

In the present matter, ALJ Larsen's RFC finding provides that Plaintiff "can perform simple repetitive tasks." AR 13. ALJ Larsen's specific references to this portion of his RFC determination refer to consultative psychiatric examiner Shireen Damania's opinion that Plaintiff "had good interpersonal and social skills and could perform simple 1-2 step jobs," as well as the state agency physician opinion that Plaintiff "could perform simple repetitive tasks in 2 hour increments." AR 14-15.

Because ALJ Larsen's "simple repetitive tasks" language does not also include a reference to "one or two-step tasking" as did ALJ Haubner's RFC finding, Plaintiff argues that ALJ Larsen improperly changed the RFC determination in the absence of new and material evidence that Plaintiff could perform jobs at a level beyond those limited to one or two steps. The Court is not persuaded by Plaintiff's argument.

First, ALJ Larsen's language seems to mirror that of ALJ Haubner, albeit excluding the phrase "one or two-step tasking." In other words, ALJ Haubner's RFC finding also stated that Plaintiff could perform "*simple repetitive*" work. AR 55, emphasis added. Thus, ALJ Larsen's omission of the phrase "one or two-step tasking" presents no error. Moreover, ALJ Larsen's RFC finding also relies upon the state agency physician opinion, dated *after* ALJ Haubner's decision, wherein state agency physician Kelly J. Loomis, M.D., determined that Plaintiff was able to sustain simple repetitive work in two hour increments throughout an eight hour workday.

1   AR 259.  State agency physician James V. Glaser, M.D., concurred, opining that Plaintiff was

2   "capable of understanding, remembering and carrying out one and two step instructions [and] is

3   able to maintain concentration, persistence and pace throughout a normal workday/workweek as

4   related to simple tasks."  AR 245.

5        In this case, the terminology used by both ALJs makes clear each found Plaintiff was

6   capable of work amounting to simple and repetitive work.  Therefore, Plaintiff's reference to and

7   reliance upon *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) is misplaced.  The difference

8   between the two RFC findings is not significant.  Plaintiff is reminded that the doctrine of res

9   judicata is less rigidly applied in administrative proceedings.  *Chavez v. Bowen*, 844 F.2d at 693.

10   ALJ Larsen's findings gave the necessary res judicata consideration to the previous RFC

11   in this case.  Hence, this Court finds no error.

12        **B.**      ***Evaluation of the Medical Evidence***

13        Next, Plaintiff argues the ALJ erred by failing to adopt the opinions of the treating

14   physicians at University Medical Center.  Plaintiff contends the ALJ did not provide specific and

15   legitimate reasons for rejecting those opinions.  (Doc. 14 at 12-15.)  In reply, the Commissioner

16   asserts that substantial evidence supports the ALJ's evaluation of the medical evidence.  (Doc. 18

17   at 9-10.)

18        **1.      Applicable Legal Standards**

19        Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

20   who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

21   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

22   physicians).  As a general rule, more weight should be given to the opinion of a treating source

23   than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

24   647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another

25   doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

26   1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another

27

28                                              9

doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer v. Sullivan*, 908 F.2d at 506 n.4; *Gallant v. Sullivan*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989); *Andrews v. Shalala*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians . . .." *Magallanes*, 881 F.2d at 752. Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

### 2. Summary of Relevant Medical Evidence

#### *University Medical Center*

Following complaints of abdominal pain and pain in the extremities on March 2, 2007, it

10

1   was noted Plaintiff's right leg was longer than his left, but there was no atrophy or tenderness.

2   An x-ray was ordered to evaluate scoliosis and labs were ordered.  AR 225-230.

3       An x-ray taken March 2, 2007, revealed marked rototary sclerosis of the lumbar spine

4   convex to the left, at approximately fifty-two degrees.  AR 231.

5       On March 21, 2007, Plaintiff was seen for a follow up.  He was counseled regarding diet

6   and exercise, medications were prescribed, and he was to return for follow up regarding leg

7   cramps.  AR 223-224.

8       On April 24, 2007, Plaintiff was seen for leg cramps, left upper extremity pain, and

9   medication refills.  Objective musculoskeletal findings revealed full range of motion in the left

10  upper extremity, and no tenderness or atrophy.  Plaintiff was to continue medications for leg

11  cramps, and follow up in six weeks.  AR 221-222.

12      On June 19, 2007, Plaintiff was treated for leg cramps and pain.  Medications were

13  prescribed and he was to return in six weeks.  AR 219-220.

14      In an August 24, 2007, disability examination, Plaintiff reported, *inter alia*, being blind in

15  the right eye.  Following examination, normal findings were recorded with the exception of

16  curvature of the spine.  The doctor concluded Plaintiff suffered from a learning disorder,

17  scoliosis and blindness in the right eye by history.  The physician checked the boxes entitled

18  "Disability" and "Permanent."  AR 218.

19      On September 21, 2007, Plaintiff was seen for complaints of back and abdominal pain.

20  The subjective complaints recorded included "eye fog over" and "blind R eye."  He was referred

21  to ophthalmology.  AR 216-217.

22      On October 16, 2007, Plaintiff was seen by optometrist Russell Schmidt.  He complained

23  of blurred vision and sought a new prescription.[4]  An examination revealed that Plaintiff's vision

24  in both eyes, with correction, was 20/25.  Sans correction, the recorded results were 20/80 vision

_____

26      [4]Next to "Present Rx 20 ____" is written "x10 yrs.," indicating Plaintiff may not have had an eye

27  examination or new glasses in nearly a decade.

in the right eye and 20/70 vision in the left.  Plaintiff was provided with a new prescription for glasses.  AR 214-215.

Plaintiff complained of leg and back pain on August 25, 2008.  Medications were refilled. AR 273.

In a disability examination dated August 29, 2008, Plaintiff reported scoliosis, a heart condition, blindness in the right eye, a dislocated left elbow, and the left leg shorter than the right.  Normal findings were recorded for the skin, head, ears/eyes/nose/throat, thyroid/neck, lungs, heart, abdomen, neuro and mental status.  Regarding abnormal findings, the physician recorded "[zero] vision [right] eye" in addition to decreased flexion in the left elbow, a left leg one and one-half to two inches shorter than the right leg, the use of a cane with limp, and "[negative] straight leg."  AR 272.  The physician's recommendation includes a box marked "Full Time/Part Time restricted Work" with a circle around the part time portion.  Limitations included no driving, work requiring climbing ladders, or use of powered equipment, no repetitive bending or lifting, no repetitive hand movements (use of keyboard less than 10 minutes in an hour), light work only (lifting less than 20 pounds), and standing or walking (less than 15 minutes in an hour).  AR 272.

On November 17, 2008, Plaintiff was treated for follow up of scoliosis and back pain, and complaints of hand stiffness.  Medications were refilled and he was to return in six weeks.  AR 269.

Plaintiff complained of continued hand pain on February 4, 2009.  Medications were refilled and prescribed.  AR 268.

On May 29, 2009, Plaintiff complained of leg pain and weakness and a fall.  He had been using a cane, and denied numbness or tingling in the legs, and also denied lightheadedness or dizziness.  AR 266.  Objective findings recorded regarding Plaintiff's legs include 2+ knee and ankle reflexes, no atrophy, normal sensation, 5/5 strength in the right leg, and 3/5 in the left with

straight leg raising limited by back pain.  Leg weakness was attributed to back pain that limits leg movement.  An x-ray was ordered and Plaintiff was to follow up.  AR 266.

An x-ray of the thoracolumbar junction dated May 29, 2009, revealed severe rotatory scoliosis of the mid thoracic spine convex to the left, centered at the L2-L3 level, with degenerative disc and facet joint changes identified along the concave aspect of the curve, secondary to altered mechanics.  AR 267.

On June 19, 2009, Plaintiff continued to be treated for back pain associated with severe scoliosis.  A referral to physical therapy for evaluation was noted.  AR 265.

### *Internal Medicine Evaluation - Rustom F. Damania, M.D.*

Plaintiff underwent an internal medicine evaluation with board eligible physician Rustom F. Damania on November 16, 2007.  AR 232-236.

After recording Plaintiff's chief complaints, various histories and the medical records reviewed, Dr. Damania conducted a physical examination.  AR 232-233.  Plaintiff was noted to be well-built and well-nourished, walking with the aid of a cane.  He was in no acute distress or discomfort.  His hair was noted to be "not very well groomed or hygienic," although his clothing was clean.  He was noted to be cooperative.  AR 233.  With regard to eyes and vision, Dr. Damania noted as follows: "Gross field of vision normal.  Vision: Right eye 20/70, left eye 20/200.  Vision with eyeglasses: Right eye 20/50, left eye 20/40."  AR 234.  Normal findings were recorded regarding vital signs, ears, nose and throat, skin, chest and lungs, cardiovascular and vascular systems, and abdomen.  AR 234.  It was noted that while Plaintiff's coordination, station and posture were normal, he exhibited a slight limp on the left side.  Romberg testing was negative.  AR 234.  Dr. Damania noted that Plaintiff reported using a cane for the past decade due to low back pain and left knee pain.  AR 234.  Range of motion findings were all within normal limits.  AR 234-235.  Dr. Damania noted Plaintiff's left knee was tender with slight crepitation, but without swelling or deformity.  He also noted a slight curvature of the thoracic and lumbar spine, and a right leg measuring one-fifth an inch longer than the left leg.  AR 235.

13

1  Motor strength was recorded at 5/5 for both upper and lower extremities and reflexes were

2  normal.  AR 235.

3      Dr. Damania diagnosed mild to moderate scoliosis with some shortening of the left leg,

4  and marked rotatory scoliosis of the lumbar spine at fifty-two degrees.  AR 236.  With regard to

5  functional assessment, Dr. Damania opined that Plaintiff could lift and carry twenty pounds

6  occasionally and ten pounds frequently, could stand and walk for six hours in an eight-hour

7  workday with normal breaks, and could sit for six hours.  Dr. Damania stated there was no

8  objective evidence that would indicate the use of an assistive device was necessary.  He

9  identified postural limitations of occasional bending, stooping and crouching.  He identified no

10  communicative impairment, nor definitive manipulative impairment.  Finally, Dr. Damania

11  stated that "[d]ue to his scoliosis and poor vision, workplace environmental limitations to

12  climbing and balancing" applied.  AR 236.

13      ***Psychiatric Evaluation - Shireen R. Damania, M.D.***

14      Board certified psychiatrist Shireen Damania conducted a psychiatric evaluation on

15  December 21, 2007.[5]  After recording Plaintiff's chief complaints and illnesses, and various

16  histories, the doctor proceeded to a mental status examination.  AR 208-210.  On examination, it

17  was noted Plaintiff was pleasant and cooperative.  His speech was normal and his mood was

18  euthymic.  His affect was broad and appropriate to thought content and situation.  Plaintiff denied

19  suicidal or homicidal ideation, hallucinations or delusions, and there were no issues regarding

20  impulse control.  There was no evidence of a thought disorder.  Plaintiff was oriented to time,

21  place and person.  Recent and past memory were intact, attention span was recorded to be within

22  normal limits, and Plaintiff was able to recall three of three objects in three minutes.  Plaintiff

23  was of average intelligence, and could identify the current and past presidents.  He "was

24

25  _____

26      [5]The date of examination is erroneously recorded as "December 21, 2004," however, it is plain that date is a typographical error given the heading on the subsequent pages of the report, notations in the top margin, and a

27  related Medical Source - Vendor Questions form dated December 21, 2007.  *See* AR 208-212.

28

1  functioning in the just average range of intellectual functioning," and could perform simple

2  mathematical calculations.  His insight and judgment were fair.  AR 210.

3      Dr. Damania's diagnoses included a learning disorder not otherwise specified at Axis I

4  and a GAF[4] score of 61 at Axis V.  In the medical source statement psychiatric, Dr. Damania

5  recorded that Plaintiff was pleasant and cooperative, had good interpersonal and social skills, and

6  displayed no difficulty in memory, concentration, persistence and pace.  Further, the doctor noted

7  Plaintiff was able to understand, carry out and remember simple one and two step job

8  instructions in an unskilled setting, was able to respond appropriately to coworkers, supervisors

9  and the public, could respond appropriately to usual work situations, and could deal with changes

10 in routine work setting with simple instructions.  It was also noted Plaintiff could handle his own

11 funds judiciously and in his own best interests.  AR 211; *see also* AR 212.

12                    ***Physical Residual Functional Capacity Assessment***

13     In a Physical Residual Functional Capacity Assessment dated January 25, 2008, James V.

14 Glaser, M.D., opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift

15 and carry ten pounds, could stand or walk and sit for about six hours in an eight-hour workday,

16 and was not limited with regard to pushing or pulling.  AR 238.  Further, the doctor opined

17 Plaintiff could frequently climb ramps or stairs, balance, kneel and crawl.  He could occasionally

18 climb ladders, ropes or scaffolds, stoop or crouch.  AR 239.  Dr. Glaser did not identify any

19 manipulative, visual, communicative or environmental limitations.  AR 239-240.

20     Roger Fast, M.D., reviewed and affirmed Dr. Glaser's findings.  AR 263.

24         [4]The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's

25 overall level of functioning.  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV").  A GAF score between 61 and 70 indicates: "Some mild symptoms (e.g.,

26 depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful

27 interpersonal relationships."  DSM-IV at 34.

1

*Psychiatric Review Technique*

2      In a Psychiatric Review Technique dated January 29, 2008, psychiatrist Kelly J. Loomis

3   opined that Plaintiff's learning disorder did not meet or equal Listing 12.05 for mental

4   retardation.  AR 246-253.  With regard to the Paragraph B criteria form - coinciding with

5   Paragraph D of Listing 12.05 in particular - Dr. Loomis indicated Plaintiff was mildly restricted

6   in the activities of daily living and his difficulty in maintaining social functioning was mild.  The

7   doctor did not identify any limitation with regard to difficulties in maintaining concentration,

8   persistence or pace.  AR 254.  Archimedes R. Garcia, M.D., reviewed and affirmed Dr. Loomis'

9   findings on May 12, 2008.  AR 263.

10

*Mental Residual Functional Capacity Assessment*

11      Additionally on January 29, 2008, Dr. Loomis completed a Mental Residual Functional

12   Capacity Assessment.  AR 257-259.  More particularly, the doctor found that Plaintiff was not

13   significantly limited in the following areas: ability to remember locations and worklike

14   procedures; ability to understand and remember very short and simple instructions; ability to

15   carry out very short and simple instructions; ability to maintain attention and concentration for

16   extended periods; ability to perform activities within a schedule, maintain regular attendance, and

17   be punctual; ability to sustain an ordinary routine without special supervision; ability to work in

18   coordination and proximity to others without being distracted; ability to make simple work-

19   related decisions; ability to complete a normal workday and workweek; ability to interact

20   appropriately with the general public; ability to accept instructions and respond appropriately to

21   criticism from supervisors; ability to get along with coworkers or peers; ability to maintain

22   socially appropriate behavior and adhere to basic standards of neatness and cleanliness; ability to

23   respond appropriately to changes in work setting; and, ability to be aware of normal hazards and

24   take appropriate precautions.  AR 257-258.

25      Dr. Loomis found Plaintiff to be moderately limited in only two areas: the ability to

26   understand and remember detailed instructions, and relatedly, the ability to carry out detailed

27

28                                                                16

1 | instructions.  AR 257.  In conclusion, with regard to understanding and memory and sustained

2 | concentration and persistence, Dr. Loomis opined that Plaintiff was "able to sustain [simple

3 | repetitive tasks] in 2 hour increments in an 8 hour workday."  AR 259.  Archimedes R. Garcia,

4 | M.D., reviewed and affirmed Dr. Loomis' findings on May 12, 2008.  AR 263.

5 | **3.    ALJ Larsen's Findings**

6 | As relevant here, ALJ Larsen determined as follows:

7 |
8 | The medical evidence shows Mr. Spain was seen at University Medical Center (hereinafter "UMC") in March, 2007, where he underwent an x-ray of his spine.  The x-ray showed marked rototary sclerosis of the lumbar spine, convex to the left.  The degree of scoliosis was estimated at 52 degrees. The treating notes indicate Mr. Spain used a cane to ambulate and his right leg was longer than the left.  A disability examination was performed in August, 2007, at UMC.  The examining doctor said Mr. Spain exhibited concrete thinking.  His diagnoses were a learning disability, scoliosis, and blindness in one eye.  The doctor opined Mr. Spain was permanently disabled.  In October, 2007, Mr. Spain had an eye examination.  This showed that both of Mr. Spain's eyes were 20/25 with correction.  Mr. Spain was seen in August, 2008, complaining of back and leg pain.  Another disability determination was performed.  The examining doctor suggested Mr. Spain should work only part-time, and could not drive, climb ladders, or use powered equipment. In addition, Mr. Spain was to lift no more than 19 pounds at one time, was to engage in no repetitive bending or lifting, was restricted to standing and walking less than 15 minutes per hour, was precluded from repetitive hand movements, and could work at a keyboard less than 10 minutes per hour.  However, some of these restrictions appear based on an incorrect diagnosis of total blindness in his right eye, when his vision in fact is correctable with glasses, as noted above.

18 | AR 14, internal citation omitted.  And, ALJ Larsen noted that he gave "no weight to the opinions

19 | of the UMC doctors regarding Mr. Spain being disabled, because this is an opinion reserved to

20 | the Commissioner under the regulations."  AR 15.

21 | **4.    Analysis**

22 | Because the opinions of the treating UMC physicians were contradicted, the ALJ was

23 | required to provide specific and legitimate reasons to reject those opinions.  *Murray v. Heckler*,

24 | 722 F.2d at 582.

25 | Here, ALJ Larsen did not discount the opinions of the treating physicians at UMC based

26 | solely on the fact that their opinions that Plaintiff was disabled were an opinion reserved the

27 |

28 | 17

Commissioner.  Rather, ALJ Larsen afforded those opinions no weight on two bases, the second being that the doctors' opinions were based, at least in part, on an incorrect assumption that Plaintiff was blind in the right eye.  A treating physician's opinion is not conclusive as to a physical condition or the ultimate issue of disability.  *Magallanes*, 881 F.2d at 751; *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  Morever, where an opinion lacks supporting clinical findings - such as those here where the medical record does not support a finding of total blindness in the right eye - that is a legitimate reason to reject a treating physician's conclusion.  *Magallenes v. Bowen*, 881 F.2d at 751.

As indicated above, an October 2007 examination of Plaintiff's eyes and vision did not establish Plaintiff was blind in his right eye.  The examination revealed that with correction, the vision in both of Plaintiff's eyes was 20/25, and absent correction, the vision in Plaintiff's right eye was 20/80.  AR 214-215.  Moreover, the disability examination dated August 24, 2007 - two months prior to the October 2007 eye examination - plainly states the reference to blindness in the right eye was by patient history only.  AR 218.

A review of the August 29, 2008, examination reveals more of the same.  Plaintiff reported being blind in the right eye.  The doctor's reference to "[zero] vision R eye" (AR 272) is contradicted by the specialists's August 2007 examination.  Notably too, while called a disability examination, there are no specific findings recorded about objective testing of Plaintiff's eyes at that time (unlike the August 2007 exam by Dr. Schmidt [*cf.* AR 214-215 to AR 272]).

Additionally, Dr. R. Damania found only "poor vision," not blindness.  AR 234, 236.  The state agency physician, after reviewing the medical records, found that Plaintiff's was not visually limited.  AR 239.

An ALJ need not believe everything a physician sets forth, and may accept all, some, or none of the physician's opinions.  *Magallanes v. Bowen*, 881 F.2d at 753-754.  The ALJ was free to disregard the UMC physicians' opinions regarding Plaintiff's visual capacities.

1  ALJ Larsen provided specific and legitimate reasons to accord no weight to the opinions

2  of the UMC treating physicians regarding Plaintiff's capabilities.  As such, his findings are

3  supported by substantial evidence and are free of legal error.

4  **C.   *Vocational Expert Testimony***

5  Plaintiff argues that where the ALJ found Plaintiff's sister's statement that Plaintiff could

6  not read or write above a second grade level to be credible, the ALJ erred by posing hypothetical

7  questions to the VE based upon Plaintiff having completed high school.  (Doc. 14 at 15-17.)  The

8  Commissioner contends the hypothetical questions posed to the VE were proper, and thus, no

9  error occurred.  (Doc. 18 at 10-11.)

10  "Hypothetical questions posed to the vocational expert must set out all the limitations and

11  restrictions of the particular claimant . . .."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

12  The testimony of a VE "is valuable only to the extent that it is supported by medical evidence."

13  *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982).  The VE's opinion about a claimant's

14  RFC has no evidentiary value if the assumptions in the hypothetical are not supported by the

15  record.  *Embrey*, 849 F.2d at 422.  However, an ALJ is only required to present the VE with

16  those limitations he finds to be credible and supported by the evidence.  *Osenbrock v. Apfel*, 240

17  F.3d 1157, 1165-66 (9th Cir. 2001).

18  Plaintiff's sister Irene A. Harikian provided a third party statement.  *See* AR 200-201.

19  Within the statement, Ms. Harikian stated, *inter alia*, that Plaintiff "cannot read nor write above a

20  second grade level.  He was in Special Education classes all through school."  AR 200.  ALJ

21  Larsen properly considered the third party statements in the record, including Ms. Harikian's

22  statement.  Specifically, the ALJ noted:

23  Mrs. Harikian stated her brother now lives with her husband and her
because he cannot live independently.  She said Mr. Spain helps around the house,
24  but needs constant reminders about his tasks.  Mrs. Harikian also reported Mr.
Spain cannot drive, is fearful of using public transportation, and reads at a second
25  grade level.  *I give some weight to these statements as they are not inconsistent
with the evidence.*

19

AR 15, emphasis added.  "Some weight" is not the equivalent of all weight, as Plaintiff would

have this Court interpret the phrase.  Mrs. Harikian is not an educational expert, thus her

assessment that her brother can read and write at only a second grade level was accorded little

weight.  By stating he gave the statement of Mrs. Harikian, as well as that of Plaintiff's brother

David Spain, "some weight," the ALJ was not adopting as true every statement contained therein.

Moreover, it is clear from the record that while Plaintiff did indeed graduate from high

school, the VE was aware that Plaintiff attended special education classes throughout that period,

in light of the testimony taken during the administrative hearing and in the VE's presence:

> [ALJ]: . . . What's the highest grade in school you've completed?
> [Plaintiff]: Twelfth, graduated.
> Q.  And were you in regular classes or special ed?
> A.  Special ed.?
> Q.  How many years?
> A.  All of high school.

AR 26-27.  Therefore, when the ALJ asked the VE to assume a hypothetical worker of Plaintiff's

"age, education, and work experience" (AR 44-45), VE Dachelet properly considered the fact

that while Plaintiff graduated high school, he had attended special education classes.  *See*

*Thomas v. Barnhart*, 278 F.3d 949, 956 (9th Cir. 2002).

Finally, while there is no evidence that Plaintiff was only capable of reading or writing at

a second grade level other than Mrs. Harikian's statement, this record contains substantial

evidence to infer Plaintiff was capable of performing unskilled[5] work:

> 1.    No difficulties in reading or writing were perceived during a face to face interview on August 21, 2007.  AR 140-142;
>
> 2.    Plaintiff answered "Yes" to inquiries about whether or not he could read and understand English, and write more than his name in English.  AR 143;
>
> 3.    "12th grade" completed; attended special education classes.  AR 148;

---

[5]Unskilled work is that "which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a) & 404.968(a).  A job is thus unskilled if "a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. § 404.1568(a).

4.  Plaintiff answered "Yes" to an inquiry about whether he performed any writing, completion of reports or similar duties with regard to his job decorating Christmas trees.  AR 152;

5.  In the psychiatric evaluation, Plaintiff advised Dr. Damania that he attended Caruthers High School and "was in special education classes from middle school to high school.  He stated he did not have any college education because he 'couldn't read or write.'" AR 209.  The doctor noted Plaintiff was "of average intelligence" and "was functioning in the just average range of intellectual functioning."  AR 211.  The doctor opined Plaintiff could understand, carry out and remember simple instructions in an unskilled work setting.  AR 212;

6.  Noted to have "Finished 12 grade. Special Ed" and "concrete thinking - eight responses."  AR 218;

7.  In a case analysis, the following is noted: "(IQ scores in prior file 72-76)."  AR 244; and,

8.  In the Mental RFC Assessment, Plaintiff was found to be moderately limited only with regard to the ability to understand, remember, and carry out, detailed instructions.  AR 257-259.

Plaintiff's references to Title 20 of the Code of Federal Regulations section 416.964 and its applicability do not demand a different result.  Plaintiff implies that because there is evidence contradicting his numerical grade level of twelve - in the form of Plaintiff's sister's statement that he can read and write at only a second grade level - the ALJ's references to a hypothetical individual who graduated high school were error.  (Doc. 14 at 16.)  However, when the regulation is viewed in its entirety, it is even more clear that VE Dachelet considered Plaintiff's particular capabilities despite his having graduated high school as the VE testified that such an individual was capable of *unskilled* work.  The regulations indicate that in evaluating an individual's educational level, it considers the following:

(1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

(2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

(3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

(4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through

21

1  formal schooling at a 12th grade level or above. We generally consider that
2  someone with these educational abilities can do semi-skilled through skilled work.

3  20 C.F.R. § 416.964(b).

4      The VE's responses to the hypothetical questions posed here resulted in an opinion that

5  the hypothetical individual was capable of unskilled work.  Had the VE strictly considered

6  Plaintiff's numerical grade level of twelve, he could have determined the hypothetical worker

7  was capable of "semi-skilled through skilled work," and yet he did not.  Essentially, the VE's

8  testimony about the hypothetical worker with Plaintiff's educational background, placed the

9  hypothetical worker in the marginal education category despite having graduated high school.

10     In sum, ALJ Larsen presented VE Dachelet with those limitations he found to be credible

11  and supported by the evidence.  *See Osenbrock v. Apfel*, 240 F.3d at 1165-66.

12     **D.    *The Credibility Determination***

13     Lastly, Plaintiff argues the ALJ failed to give clear and convincing reasons to reject his

14  testimony.  (Doc 14 at 17-20.)  In response, the Commissioner asserts that ALJ Larsen properly

15  found Plaintiff was not fully credible.  (Doc. 18 at 11-13.)

16     A two step analysis applies at the administrative level when considering a claimant's

17  subjective symptom testimony.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).  First, the

18  claimant must produce objective medical evidence of an impairment that could reasonably be

19  expected to produce some degree of the symptom or pain alleged.  *Id*. at 1281-1282.  If the

20  claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the

21  claimant's testimony regarding the severity of his symptoms only if he makes specific findings

22  that include clear and convincing reasons for doing so.  *Id*. at 1281.  The ALJ must "state which

23  testimony is not credible and what evidence suggests the complaints are not credible." *Mersman*

24  *v. Halter*, 161 F.Supp.2d 1078, 1086 (N.D. Cal. 2001), internal quotations & citations omitted

25  ("The lack of specific, clear, and convincing reasons why Plaintiff's testimony is not credible

26  renders it impossible for [the] Court to determine whether the ALJ's conclusion is supported by

27

28                                22

1   substantial evidence"); Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be

2   sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

3   the adjudicator gave to the individual's statements and reasons for that weight").

4        An ALJ can consider many factors when assessing the claimant's credibility.  *See Light v.*

5   *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ can consider the claimant's

6   reputation for truthfulness, prior inconsistent statements concerning his symptoms, other

7   testimony by the claimant that appears less than candid, unexplained or inadequately explained

8   failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily

9   activities, claimant's work record, or the observations of treating and examining physicians.

10  *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).  "An ALJ is not

11  'required to believe every allegation of disabling pain' or other non-exertional impairment."  *Orn*

12  *v. Astrue*, 495 F.3d at 635, citation omitted.

13       "Despite the inability to measure and describe it, pain can have real and severe

14  debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from

15  working." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  It is possible to suffer disabling

16  pain even where the degree of pain is unsupported by objective medical findings.  *Id*.  "In order

17  to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that

18  decision." *Id*., citing *Magallanes v. Bowen*, 881 F.2d at 755.  The findings must convincingly

19  justify the ALJ's rejection of the plaintiff's excess pain testimony.  *Id*. at 602.  However, an ALJ

20  cannot be required to believe every allegation of disabling pain.  "This holds true even where the

21  claimant introduces medical evidence showing that he has an ailment reasonably expected to

22  produce some pain." *Id*. at 603.

23       ALJ Larsen made the following findings in this case:

24       Mr. Spain testified he lives with his sister and her family.  He said his
         family drives him where he needs to go.  Mr. Spain testified he helps with some
25       household chores, cares for their pets, and prepares simple meals.  He stated he
         cannot lift more than 5-10 pounds, and can only use his left arm for one hour at a
26       time without rest.  Mr. Spain testified he can sit for 2 hours, stand for 90 minutes,
         and walk about five blocks.  He stated he has pain in both his upper and lower

27

28                                               23

1    back, and he has to lie down 4-5 times a day.  To some extent, Mr. Spain is credible.

2            After carefully considering the evidence, I find Mr. Spain's medically-determinable impairments can reasonably be expected to produce some of his

3    alleged symptoms, but his statements about the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with

4    my assessment of his residual functional capacity.

5            In sum, my assessment of Mr. Spain's residual functional capacity is supported by the objective evidence.

6    AR 15-16.

7        The first step in assessing Plaintiff's subjective complaints is to determine whether

8    Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

9    alleged.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  Here, as noted above, the

10   ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to

11   cause some of his alleged symptoms.  AR 16.  This finding satisfied step one of the credibility

12   analysis.  *Smolen*, 80 F.3d at 1281-1282.

13       With regard to the second step, however, ALJ Larsen's findings are insufficient.  An ALJ

14   can look to daily living activities as part of the credibility analysis.  *Burch v. Barnhart*, 400 F. 3d

15   at 680; *Fair v. Bowen*, 885 F.2d at 603; *see also Thomas v. Barnhart*, 278 F.3d at 958-59.

16   If a claimant is able to spend a substantial part of his day engaged in pursuits involving the

17   performance of physical functions that are transferable to a work setting, a specific finding as to

18   this fact may be sufficient to discredit a claimant's allegations.  *Morgan v. Commissioner of*

19   *Social Sec. Admin*., 169 F.3d at 600.  The ALJ must make "specific findings relating to [the

20   daily] activities" and their transferability to conclude that a claimant's daily activities warrant an

21   adverse credibility determination.  *Orn v. Astrue*, 495 F.3d at 639.  Here, while the ALJ

22   identified the daily activities of Plaintiff helping with "some household chores, car[ing] for []

23   household pets, and preparing simple meals" (AR 15-16), he failed to make specific findings

24   about their transferability to a work setting.

25       More particularly, regarding the activities of daily living, Plaintiff testified at the

26   administrative hearing as follows:

27

28                                                24

[ALJ]: . . . Now, do you do anything else to help [your sister]?
[Plaintiff]: I try to keep the house done.
Q.  What, what do you do around the house?
A.  Vacuum.  I got, she got a little vacuum.
Q.  How often do you vacuum?
A.  I try, I try to get it done once a week or I get yelled [at].
Q.  Okay.  Anything else that you help with?
A.  The birds.  She's got a couple birds.
Q.  And what do you do with the birds?
A.  Feed and water them.
Q.  Is that daily?
A.  Every other day.
Q.  Anything else?
A.  Take care of my dog and her dog[;] put them out and feed them.
Q.  Okay.  Do you walk your dog?
A.  No.  It would bite somebody.
Q.  You, I'm sorry, you what?
A.  It would bite somebody.
Q.  Oh, okay.
A.  I just let them out the side of the, they got a hole in the door, and they
go out and come in.
Q.  So they go in the backyard.
A.  Yeah.
Q.  Okay.  Do you do anything else around the house to help out?
A.  I do my own cooking.
Q.  How - -
A.  Which is corn and grilled cheese.  That's all I could do.
Q.  How many times a day do you cook?
A.  Every day.  And she's got a little oven on her [INAUDIBLE].  If you put stuff
and [INAUDIBLE] the big one with the little one.
Q.  They got something on the counter?
A.  Yes.
Q.  Okay.
A.  I use that.  Because I'm scared to use an oven.
Q.  Do you do the dishes after you cook for yourself?
A.  Yes.  Put it in the microwave.  I mean, the microwave.  In the
dishwasher.
Q.  Okay.  Do you do anything else?
A.  Do my laundry.
Q.  Okay.  Anything else?
A.  I think that's it.

AR 36-38.

ALJ Larsen's findings do not explain how Plaintiff's abilities to vacuum once a week, do

laundry, to care for a couple dogs and feed and water a couple birds every other day, and to use

the microwave and load the dishwasher on a daily basis, transfer into a work setting.  Rather,

here, like the Ninth Circuit found in *Orn*, "there is neither evidence to support that [the

1    claimant]'s activities were 'transferable' to a work setting nor proof that [the claimant] spent a

2    'substantial' part of his day engaged in transferable skills." *Orn v. Astrue*, 495 F.3d at 639.

3         The Commissioner contends that the "record reflects that Plaintiff provided contradictory

4    evidence about his abilities," and that given these inconsistencies, "the ALJ properly gave only

5    partial credibility to the testimony and statements of Plaintiff and his siblings."  (Doc. 18 at 12.)

6    While there may in fact be inconsistencies in the record, or testimony and statements that could

7    be interpreted to be inconsistencies, the fact remains that ALJ Larsen did not offer those

8    inconsistencies as a reason to find Plaintiff less than fully credible.  Therefore, this Court cannot

9    consider it.  A reviewing court cannot affirm an ALJ's decision denying benefits on a ground not

10   invoked by the Commissioner.  *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006) (*citing*

11   *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001)).

12        In conclusion, the ALJ failed to provide clear and convincing reasons for rejecting

13   Plaintiff's testimony about his ability to work.  His reliance on Plaintiff's activities of daily living

14   is insufficient.  Therefore, ALJ Larsen's credibility determination is not supported by substantial

15   evidence and is not free of error.

16                                      **CONCLUSION**

17        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

18   substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

19   further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

20   judgment in favor of Plaintiff Delbert E. Spain and against Defendant Michael J. Astrue,

21   Commissioner of Social Security.

22

23        IT IS SO ORDERED.

24        **Dated:   July 16, 2012**                    **/s/ Gary S. Austin**
                                              UNITED STATES MAGISTRATE JUDGE
25

26

27

28                                            26